**Alvin BERGSIEKER, Appellant,**

v.

**SCHNUCK MARKETS, INC., and A.W. Schnur Construction Company, Respondent.**

**No. 61628.**

Missouri Court of Appeals, Eastern District, Division Four.

Feb. 9, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 10, 1993.

Application to Transfer Denied April 20, 1993.

Marc P. Weinberg, St. Louis, for appellant.

Charles E. Reis, IV, Steven Asher, Bryan M. Groh, David T. Butsch, St. Louis, for respondent.

CRAHAN, Judge.

This is an appeal filed by Plaintiff, Alvin Bergsieker, personal representative of the estate of Velma Bergsieker, deceased, ("Plaintiff") alleging error in the trial court's denial of his timely motion for new trial in an action for personal injuries originally brought by Plaintiff's wife, Velma Bergsieker ("Velma"). Velma died of unrelated causes prior to trial. Velma alleged that she suffered a broken hip in a fall at a grocery store parking lot. After a lengthy trial, the jury found no fault on the part of any party. Accordingly, judgment was entered in favor of the defendants, Schnuck Markets, Inc. ("Schnuck") and A.W. Schnur Construction Company ("Schnur") (collectively "Defendants"). We affirm.

In his appeal, Plaintiff asserts seven points of error.[1] Only one point merits extended discussion. In that point Plaintiff asserts that the trial court erred in instructing the jury that it could not consider Velma's deposition against defendant Schnur. Velma's deposition was taken when Schnuck was the only party defendant, approximately four months before the petition was amended to add Schnur as a party defendant (along with several others who were later voluntarily dismissed from the case). Plaintiff's remaining points, to the extent they were properly preserved, will be discussed briefly.

The incident giving rise to the suit occurred on November 17, 1988. Velma was then 69 years old and was suffering from numerous maladies including diabetes, breast carcinoma which had metastasized to her bones, and cataracts. She had previous surgery to her back, a history of weakness in her left knee and problems ambulating which prompted surgery on her left knee approximately two years prior to the incident. In 1987, Velma experienced a fainting episode that caused her to fall. In the spring and summer of 1988, Velma had cancer in her left femur, necessitating radiation treatment. She experienced swelling and stiffness in her left leg. The ligaments and tendons in that leg were affected by the radiation therapy. These preexisting problems with her left leg affected Velma's balance and gait and caused her to have difficulty walking, necessitating the use of a metal walker or the assistance of her husband's arm. Prior to the incident,

---

1. We must and do consider carefully every point properly preserved and presented on appeal. Nevertheless, we caution that the intermingling of points which obviously lack merit or were not preserved with those of at least arguable merit cannot help but detract from the latter. Counsel are thus well advised to limit the points relied on to issues that were clearly brought to the attention of the trial court, in a timely manner, and resulted in manifest prejudice justifying the relief sought on appeal.

Velma had not been out shopping for months and had a nursing service attending her at home.

On the date of the incident, Velma decided to accompany her husband on a shopping trip to their local Schnucks grocery store, where they had shopped several times in the past. The weather was clear and dry. Plaintiff drove their four-door sedan and Velma occupied the passenger seat. Velma's walker was in the rear seating area behind her.

At the time of the incident, the Schnucks grocery store was undergoing renovations which necessitated certain temporary changes in the parking area of the store. Schnur was the general contractor for the renovations, which were being performed according to plans provided to Schnur by Schnuck. In accordance with the plans, Schnur barricaded the main driveway in front of the store which had been used for access to rows of angled parking spaces. As a temporary replacement, Schnur's subcontractor Flyer Striping painted over some of the existing spaces, including the former designated handicapped spaces, with black paint. It then outlined a new, temporary driveway with yellow paint. Flyer Striping also painted new, temporary "islands" of closely-spaced diagonal lines to indicate "no parking" areas and five new twelve foot wide handicapped spaces. These were designated by painting the well-known international symbol inside the space.[2] This work occurred on September 6, 1988.

Later, at the request of Schnuck, Schnur had Flyer Striping come back and paint handicapped symbols on two additional spaces in each row, for a total of fifteen handicapped spaces. However, the existing nine foot width of these spaces was not changed because there were already a sufficient number of required handicapped spaces and the arrangement was considered temporary. This work was accomplished on September 13, 1988.

According to Plaintiff and Velma, who were the only witnesses to the incident, upon their arrival at the Schnucks grocery, Plaintiff proceeded to park in one of the temporary handicapped spaces, which was adjacent to one of the temporary islands. After parking, Plaintiff exited the driver's side of the car and proceeded around the back of the car to retrieve Velma's metal walker from the back seat. In the meantime, Velma opened her door, swung her legs around and stood up facing the rear of the car. Velma and Plaintiff testified that as Velma started to take a step with her left foot, her foot came in contact with a concrete curb, causing her to fall on her left side. Velma cried out to Plaintiff that she thought she had broken her hip.

Instead of seeking aid or assistance from anyone at Schnucks, Plaintiff assisted Velma back into the car and took her home. Once back at home, the Bergsiekers called Velma's doctor, who instructed them to proceed to the emergency room at St. Luke's Hospital. They did so and, after x-rays were taken, Velma was diagnosed as having a minimally displaced left femoral neck fracture (*i.e.*, a broken hip). Velma was hospitalized at St. Luke's hospital where she underwent surgery to correct the fracture and extensive physical, recreational and occupational therapy prior to her discharge on December 10, 1988.

While Velma was in the hospital, the Bergsiekers contacted their family attorney who had his associate, Mr. Weinberg, contact them to investigate the incident. Mr. Weinberg met Plaintiff on the parking lot a week after the incident and took pictures of the lot and of the parking space where the fall allegedly took place. Later, Mr. Weinberg met Plaintiff at the lot a second time and Plaintiff took measurements of the space in which he claimed to have parked. Neither the Bergsiekers nor their attorneys notified Schnuck of the incident prior to the taking of these photographs and measurements.

---

**2.** The spaces were also later marked with a sign at the front of each space affixed to a pole supported by a barrel.

The photographs taken by Mr. Weinberg, which were admitted into evidence, depict a yellow movable concrete curbing, several feet in length, lying largely within one of the temporary painted islands and protruding slightly over the line outlining the adjacent parking space. The size and shape of the concrete curbing is indistinguishable from those frequently encountered at the head or front of parking spaces at many establishments. However, the individual responsible for parking areas maintained by Schnuck testified without contradiction that Schnuck did not employ these devices on its parking lots because they cause maintenance problems and interfere with sweeping operations.

Neither the origin nor the disposition of the particular concrete curbing alleged to have caused Velma's fall was ever established by the evidence. The painter from Flyer Striping who performed the striping work described above testified that the concrete curbing depicted in Mr. Weinberg's photographs was not and could not have been present in the location shown in the photographs as of September 6, 1988 when he performed the work. This is because it would have been physically impossible for him to have painted the diagonal striping for the temporary island upon which the curbing was located if the curbing was present. Kevin Schiller, a courtesy clerk who retrieved carts and assisted customers with bags gave somewhat contradictory testimony to the effect that the curbing had been in the location shown in the photograph since the store opened, it was not there when the temporary island was a regular parking space prior to construction, and he could not remember seeing the curbing in that location during construction.

### Exclusion Of Velma's Testimony As To Schnur

 In his first point of error, Plaintiff maintains that the trial court erred in granting Schnur's motion in limine precluding Plaintiff's use of Velma's deposition against it.[3] Plaintiff acknowledges the general rule that a deposition taken prior to the joinder of a party to a case is inadmissible against that party because there has been no opportunity to cross-examine the deponent. *First National Bank of St. Petersburg v. Switzer,* 277 S.W.2d 689, 691–92 (Mo.App.1955). Nevertheless, Plaintiff urges that Velma's deposition was admissible against Schnur in this instance because: (1) Schnur would not have been prejudiced; (2) there was a unity and identity of interests between Schnur and Schnuck; and (3) Schnur waived its right to cross-examine by failing to object to the use of the deposition in a timely manner. We disagree.

The chronology of events concerning the taking and offering of Velma's deposition is instructive. Velma filed this action on February 10, 1989 naming only Schnuck as a defendant. Schnuck was served on February 23, 1989. On March 7, 1989, prior to the filing of Schnuck's answer and before any formal discovery, Velma sought and received an order from the trial court granting leave to take her deposition to preserve her testimony. Her videotaped deposition was taken later that same day.[4] Later, after extensive discovery, Velma's counsel concluded that other individuals or entities might be responsible for the condi-

**3.** On its face, this point preserves nothing for review because it is directed at the trial court's ruling on the motion in limine, which is an interlocutory order and is not appealable. From the argument, however, it is clear that Plaintiff's actual complaint is that, at the time Plaintiff sought to play Velma's videotaped deposition for the jury, the trial court gave an oral instruction that "... the jury may not consider the testimony contained in the deposition as evidence against the defendant A.W. Schnur Construction Company." This was also the thrust of the objection submitted in Plaintiff's motion for new trial. Further, Schnur makes no complaint in its brief concerning Plaintiff's misdesignation of the true ruling complained of or that Plaintiff's objection was not properly preserved. Because it is clear that the deficiencies in Plaintiff's point did not mislead or prejudice Schnur, we will exercise our discretion to consider the merits.

**4.** Plaintiff concedes in his brief that the procedure employed did not satisfy the requirement of Mo.R.Civ.Pro. 57.02. However, the deficiencies in the procedure employed are not in issue in this appeal.

tion of the parking lot. On July 6, 1989, Velma amended her petition to add several additional defendants. All but Schnuck and Schnur were subsequently dismissed prior to trial. Schnuck and Schnur filed their answers to this amended petition on July 14 and September 7, 1989 respectively. On August 28, 1989, prior to the filing of Schnur's answer, Velma gave written notice that she intended to use her videotaped deposition at trial. Schnur considered taking Velma's deposition but decided against it and so notified Velma's counsel by letter dated November 22, 1989. On December 28, 1989, Velma's counsel acknowledged this letter, pointed out that Velma was in very poor health and was suffering from bone cancer, and reiterated his intent to use the March 7, 1989 deposition at trial, concluding:

"With that in mind, if at any time in the future you change your mind and wish to take my client's deposition do not hesitate to contact me.

"If I do not hear from you in the near future I will assume by your silence that although you were informed by me that I would produce my client for a supplemental deposition you chose not to exercise that option."

Schnur's counsel promptly responded with a letter dated January 2, 1990 which advised Velma's counsel:

"You are correct that we no longer desire to take the deposition of Velma Bergsieker. We, however, will object to the use of her deposition at trial against us since we were not represented at the deposition. If you intend to preserve your client's testimony for use against us at trial, we suggest that you take her deposition for that purpose. We, of course, would attend this supplemental deposition."

Shortly thereafter, on January 11, 1990, Velma's counsel filed a motion for a protective order, attaching the foregoing correspondence and requesting that Velma be permitted to use her March, 1989 deposition at trial against all parties. On January 19, 1990, this motion was denied by the presiding judge, "said matter to be determined by the trial court." The presiding judge further ordered that if any defendant desired to take Velma's deposition "it shall be taken within 10 days of the date of this order." No further depositions of Velma were taken. On August 3, 1990, Velma succumbed to cancer and Plaintiff was substituted in his capacity as personal representative.

Trial of this case began on November 18, 1991. On the morning of trial, Schnur filed a motion in limine to either exclude Velma's deposition or instruct the jury that they were not to consider Velma's deposition testimony against Schnur. The trial court granted this motion and, as previously indicated, so instructed the jury just prior to the playing of her videotaped deposition.

In support of his contention that this instruction was error, Plaintiff relies on *Breeding v. Dodson Trailer Repair,* 679 S.W.2d 281, 286–87 (Mo. banc 1984) and *H— v. D—,* 373 S.W.2d 646, 653 (Mo. App.1963). According to Plaintiff, *Breeding* sets forth three exceptions to the general rule that a deposition is inadmissable against one who was not a party at the time it was taken, all three of which are claimed to be satisfied here: (1) where its admission caused no prejudice; (2) where there is a unity and identify of interests and issues by a previously joined and participating party; and (3) where there is no surprise to the new party or that party has waived its right to cross-examine the deponent. This is not a correct statement of the law discussed and applied in the cited cases.

*Breeding* was an action for personal injuries sustained in a vehicular rear-end collision. The driver of the lead car sued Dodson, the employer of the driver who collided with him, and TIME, the owner of the truck the employee was driving. Before TIME was joined as a party, the plaintiff deposed his medical expert, Dr. Leubbert. TIME was aware of and reviewed Dr. Leubbert's deposition, in which he stated that due to his office hours he would be unable to appear personally. In answer to TIME's interrogatories, Dr. Leubbert was

named as the expert witness upon whose testimony plaintiff intended to rely. In his opening statement, plaintiff's counsel told the jury, without objection, that Dr. Leubbert's deposition testimony would be read into evidence. TIME's first objection came on the third day of trial when plaintiff sought to introduce the deposition. The Supreme Court held this objection to be too late, characterizing TIME's silence as an impermissible lulling of the plaintiff and the trial court. *Breeding*, 679 S.W.2d 281 (Mo.App.1984). Further, the Supreme Court noted with approval the trial court's observation in overruling TIME's objection that a prompt objection by TIME would have allowed for the deposition to be retaken in an evening hour or that even a continuance could have been granted.

*H— v. D—* was an action seeking modification of child custody in which the plaintiff, after entry of an interim order allowing defendant to remove the child to California, sought permission to introduce additional evidence in the form of three depositions to be taken in California. The court issued a commission for same and the first two depositions were taken at the time and place specified in the commission with attorneys for both parties in attendance. At the conclusion of the second deposition, the plaintiff's attorney requested that the deposition of the third witness be adjourned to a hospital about a mile away where the witness had been admitted the day before. The defendant's counsel objected that this adjournment was outside the scope of the commission and did not attend the third deposition, which the plaintiff's attorney proceeded to take. These three depositions were filed with the trial court. The plaintiff then offered the depositions by written tender which was served on the defendant's attorney. On the same day, the defendant's attorney addressed a letter to the court stating that he had not had an opportunity to read the depositions or to make any objections and requested an opportunity to do so before the depositions were received. The trial court waited 78 days for objections to be made by the defendant. None were made. The trial court then entered judgment for the plaintiff.

On appeal, the court stated that objections to the manner in which a deposition is taken must be brought to the trial court's attention at the earliest reasonable opportunity so the trial court itself may correct such errors or irregularities. Otherwise, such objections are waived. 373 S.W.2d at 653. On that basis, the court held that the deposition was properly received in evidence. 373 S.W.2d at 654.

■ Plaintiff states the holding of *Breeding* and *H— v. D—* to be that "a defendant will waive its right to object to the use of a deposition unless it files a motion to quash or to suppress when it *first* becomes aware that the deposition is going to be used in plaintiff's case." Plaintiff asserts that, despite written notice of Plaintiff's intent on August 28, 1989, Schnur did not object to the same until the day of trial, nearly 27 months later. This is a misreading of the law and a misstatement of the facts.

Plaintiff's interpretation of *Breeding* and *H— v. D—* would change the general rule of inadmissibility, plainly restated with approval in *Breeding*, into a rule of presumptive admissibility absent immediate objection. Such a presumption would be inconsistent with the rationale for the general rule—*i.e.*, that the proponent of testimony must offer her opponent the opportunity to *cross-examine* the witness. Offering to make a witness "available for deposition" by the opponent is not, as Plaintiff appears to assume, the equivalent of offering an opportunity for cross-examination. Making the witness "available for deposition" impermissibly shifts to the opponent the burden of arranging for notice, a reporter, a site, etc., when the opponent has no way of knowing if the earlier testimony will ever be used at trial. Had Velma lived and remained competent, her deposition testimony would not have been admissible as part of her case against Schnur. It is not Schnur's responsibility to preserve evidence Plaintiff might need at trial. It is Plaintiff's. This is at least implicitly acknowledged in *Breeding* by the Supreme Court's approval of the trial court's statement that a timely objection would have

allowed the deposition *to be retaken.* 679 S.W.2d at 287.

Further, contrary to Plaintiff's assertion that Schnur made no objection until the date of trial, Schnur's counsel clearly stated his intent to object and even suggested to Plaintiff the proper procedure for preserving Velma's testimony for use against Schnur—*i.e.*, retake the deposition upon proper notice to all parties.[5] Thus, Schnur cannot be condemned for lulling Plaintiff and the trial court so as to preclude corrective action to meet the objection as was the case in *Breeding.* Nor can Plaintiff properly complain of Schnur's action in tendering its motion in limine on the morning of trial. Velma's request for an earlier ruling to the effect that her testimony would be admitted over Schnur's objection was denied, thus putting Plaintiff on notice that the issue was not and would not be resolved until trial. Velma could have mooted the issue by retaking her deposition but elected to gamble. The gamble was unsuccessful and cannot now be revived by assigning error to the trial court.

Plaintiff also urges that he satisfied the other two "exceptions" discussed in dicta in *Breeding:* lack of prejudice and unity and identity of interest and issues between Schnucks and Schnur. Actually, a closer examination of the cases cited for these "exceptions" to the general rule reveals that only the latter can properly be considered an exception to the general rule and that it is far narrower than Plaintiff maintains.

■ Although the Supreme Court did characterize "lack of prejudice" as an "exception" in its preliminary discussion of the issue in *Breeding,* the case cited as establishing this "exception" does not support that characterization. In that case, *A.M. Legg Shoe Co. v. Brown Leather Co.,* 249 S.W. 147 (Mo.App.1923), the plaintiff brought an action on an account against

Brown Leather Company, which answered and attached an affidavit by Mrs. Brown, one of the directors, alleging that, at the time the suit was filed, the defendant was not a corporation. The plaintiff later amended the petition naming Mr. and Mrs. Brown as parties defendant, alleging that Brown Leather Company had been dissolved and that Mr. and Mrs. Brown, as the former directors and managers, had converted the assets to their own use and were thereby liable for the account. Prior to the filing of the amended petition against Mr. and Mrs. Brown the plaintiff took the deposition of one of the plaintiff's officers. After amending the petition, the plaintiff took the deposition over again. The substance of the officer's deposition was the same in both depositions. Apparently, both depositions were admitted in evidence despite the Browns' objections to the first deposition on the ground that they were not then parties. Although the court questioned whether the rule was applicable inasmuch as the Browns were in reality the corporation, the court held that any error in admitting the first deposition was harmless because the officer's testimony was the same in both depositions and thus could not have affected the result. 249 S.W. at 148.

*Legg Shoe* does not hold that lack of prejudice is a basis for admitting the deposition. The court expressly assumed for purposes of its analysis that admission of the deposition was error. The holding of *Legg Shoe* is that, under the circumstances presented, the error was harmless because it could not have affected outcome of the case. Thus, *Legg Shoe* does not establish "lack of prejudice" as an exception in the sense that a trial court could be considered to have erred in *denying* admission of a deposition taken before the opponent was a party. Moreover, except under the peculiar facts at issue in *Legg Shoe,* it is difficult to conceive how a lack of prejudice

---

5. We decline Plaintiff's invitation in the Reply Brief to interpret Dr. Luh's testimony as indicating that Velma was no longer competent at the time Schnur's counsel made this suggestion. Dr. Luh did not so opine. Further, Plaintiff himself urges in support of his waiver argument that Schnur was given 10 days by the presiding judge to depose Velma and declined to do so. This was *after* Schnur raised its objection. Plaintiff cannot have it both ways. If Velma was competent enough for Schnur to depose her, she was sufficiently competent to have her deposition retaken by her own counsel.

could be shown because the prejudice lies in the lack of any opportunity for cross-examination. Because no cross-examination has occurred, a trial court or an appellate court would have no record from which to determine whether the cross-examination would have impacted the result. Contrary to Plaintiff's contention, the fact that Schnur could have filed interrogatories and did not do so does not support a finding that Schnur would not have been prejudiced by the admission of the deposition without an opportunity for cross-examination. Interrogatories are no substitute for cross-examination.

■ Plaintiff is correct that there are cases recognizing an exception to the general rule of inadmissibility where there is a clear identity of issues and identity of interests between the party against whom the testimony is offered and one who was a party at the time the testimony was taken. *See e.g., Bartlett v. Kansas City Public Service Co.*, 349 Mo. 13, 160 S.W.2d 740, 742–45 (Mo.1942). That is plainly not the situation here. At argument, Plaintiff urged that it would have been permissible under the evidence and instructions for the jury to have found either Schnuck or Schnur or both liable for Velma's injuries. Under such circumstances, Schnuck's and Schnur's interests were obviously not identical. While both had an interest in defeating Plaintiff's claim, it was equally in each party's interest to persuade the jury that any fault that might be assessed should be assessed to the other. Moreover, we note that at the time Velma's deposition was taken, Schnuck had not had any opportunity to conduct any formal discovery. Under such circumstances, Schnuck's limited examination of Velma provides no assurance that Schnur's interests were sufficiently protected so as to justify admission of the deposition without an opportunity for cross-examination by Schnur. *See generally Bartlett*, 160 S.W.2d at 744–45 and authorities cited therein. We find no error in the exclusion of Velma's testimony as against Schnur.

## Remaining Issues

■ Plaintiff claims error in permitting Defendants to introduce evidence about when they were notified of Plaintiff's claim to have fallen on the parking lot. The evidence was that neither Velma nor Plaintiff contacted anyone at Schnuck to report the accident and that Schnuck first learned of the alleged incident about three weeks after the accident in a letter from the Bergsiekers' attorney. Plaintiff urges that this information was irrelevant to any issue raised in the petition. We disagree.

Defendants denied each of Plaintiff's allegations about what occurred on the parking lot and introduced substantial evidence to the effect that Velma's fall was the result of her persistent and preexisting injuries to her left leg and her inability to ambulate without assistance, and was not due to any condition on the parking lot. Evidence is relevant if the fact offered to be proved logically renders probable the existence of a fact in issue. *Alexander v. Estate of Groves*, 618 S.W.2d 233, 235 (Mo. App.1981). It is certainly logical to infer that one who believes she has been seriously injured as a result of a dangerous condition on a grocery store parking lot rather than as a result of her own negligence would immediately summon the manager, demand medical assistance, and point out the dangerous condition so that it can be corrected before anyone else is hurt. Conversely, making no report of the incident even upon returning to the scene to take photographs and measurements, thereby depriving those claimed to be responsible of any opportunity to view the condition as it then existed, logically supports an inference that the injury may have occurred in some other manner. We rule this point against Plaintiff.[6]

---

**6.** Plaintiff's principal authority, *Carlyle v. Lai,* 783 S.W.2d 925, 928–30 (Mo.App.1989) is inapposite. *Carlyle* condemns inquiries as to when a plaintiff first hired an attorney. At no time did Schnuck or Schnur attempt to elicit any evidence as to when Velma or Plaintiff sought the advice of counsel.

Plaintiff next maintains that the trial court erred in admitting, over his objection, evidence of how long the Bergsiekers had been married. Plaintiff's objection at trial was that the evidence was irrelevant and immaterial. We agree with Plaintiff that evidence of family status is ordinarily irrelevant and inadmissible. However, the general rule does not apply when that evidence is relevant or pertinent to an issue raised in the case. *Deskin v. Brewer*, 590 S.W.2d 392, 401 (Mo.App.1979). Further, the trial court is vested with wide discretion in controlling the scope of cross-examination, particularly on collateral matters. *Maul v. Filimon*, 315 S.W.2d 859, 866 (Mo.App.1958). Here, Plaintiff testified on direct examination to the fact of his marriage to Velma and to their respective advanced ages. Plaintiff also testified about his wife's daily activities, his knowledge of her previous illnesses and injuries, and his observations and recollections with regard to whether Velma had previously experienced pain in her left hip. Under such circumstances, we agree with Defendants that it was within the trial court's sound discretion to permit brief questioning to establish that the Bergsiekers had been married only eight years at the time of the incident. Such evidence would tend to dispel the inference that Plaintiff's testimony was based on a lifetime of observation. We find no error on the part of the trial court.

Plaintiff's next point of error is as follows:

"IV. The trial court erred in denying Plaintiff the right to cross examine Schnuck employee Kevin Schiller (T.Vol. I, p. 80, 72), because under Missouri law a party has the absolute right to cross examine an adverse party. The evidence established that Kevin Schiller was a long standing employee of Schnuck, whose testimony was adverse to

Schnuck, thereby making him a "party" as that term is used in Chapter 491.030 R.S.Mo. (1986)." [7]

This was not Plaintiff's contention before the trial court. What transpired at trial was the following:

MR. WEINBERG Q: Referring to Exhibit 7, is it fair to say that you've seen this block on the parking lot at 7057 Chippewa before?

MR. REIS: I object to the form of the question. It's leading.

MR. WEINBERG: Your Honor, this witness is represented by Schnuck's counsel and is called, as all these witnesses, as hostile witnesses.

THE COURT: Is that an objection or what? An explanation or what?

MR. WEINBERG: I thought the explanation was as to his objection.

THE COURT: I'll sustain the objection. Ask the proper question now.

At no point in the trial did Plaintiff ever claim that Mr. Schiller, a "bag boy" at the Schnucks market, was a party to this case, which he quite clearly was not. A party to an action is a person whose name is designated on the record as a plaintiff or defendant. *M & A Electric Power Coop. v. True*, 480 S.W.2d 310, 314 (Mo.App.1972). Nor, from our review of the record, was he hostile to anyone. Further, Plaintiff made no attempt to articulate to the trial court any facts he was having difficulty establishing by reason of his inability to lead the witness. We find no error in the trial court's ruling.

Plaintiff's next point of error is as follows:

"V. The trial court erred in making certain evidentiary rulings and in allowing the defendants to make statements during their closing arguments (T.Vol. III, p. 667, 670–71, 675, 679), which, among other things, impugned the integrity of

---

7. Section 491.030 RSMo.1986 provides:

**491.030. Adverse party may be compelled to testify in civil cases.**— Any party to any civil action or proceeding may compel any adverse party, or any person for whose immediate and adverse benefit such action or proceeding is instituted, prosecuted or defended, to testify as a witness in his behalf, in the same manner and subject to the same rules as other witnesses; provided, that the party so called to testify may be examined by the opposite party, under the rules applicable to the cross-examination of witnesses.

Plaintiff's counsel, because such statements were made to appeal to the prejudice of the jury against Plaintiff and were not based on the evidence of record."

This is not a properly presented point relied on. *See Thummel v. King*, 570 S.W.2d 679, 684–88 (Mo. banc 1978).[8] No "evidentiary rulings" are specified in the point and the transcript references are all to closing argument. The vague reference to "among other things" preserves nothing for review. We decline to search the record or the argument portion of the brief for "other things." "Impugning the integrity of Plaintiff's counsel" could form the basis for a proper point if we were also informed *wherein* the arguments complained of either appealed to the prejudice of the jury against Plaintiff or were not supported by the record. A proper point relied on must give the court and the party opponent notice of the precise issues presented for resolution. Inasmuch as opposing counsel do not appear to have been misled with respect to Plaintiff's complaints about arguments allegedly impugning his counsel's integrity, we will exercise our discretion to address those arguments, and only those arguments.

▮ The gist of Plaintiff's complaint appears to be directed to the following passage appearing in the transcript:

> MR. REIS: (Continuing) Ladies and gentlemen, plaintiff's attorney has told you about these pictures and he's shown you pictures of the concrete curb. Unfortunately, plaintiff's attorney didn't see fit when these pictures were taken to let us know—Schnuck's know of this incident. I wasn't out there when these pictures were taken. I don't know what happened. These carts are there. We don't see any other carts in any other pictures in there. Plaintiff's attorney is the one who took these photographs. Something isn't right.

> I don't know about this concrete curb. There was no mention in the records. Plaintiff fell at Schnuck's and then, all of a sudden, when do we hear about tripping over a concrete curb? It's after Mr. Weinberg gets in the case.
>
> MR. WEINBERG: I object, Your Honor. There's no evidence of that fact at all.
>
> THE COURT: The jury will be bound by the evidence it's seen and remembers in this courtroom.
>
> You may proceed.
>
> MR. REIS: Ladies and gentlemen, the admission records says she fell at Schnuck's. It doesn't mention any concrete curb. There's no mention of notice about it or anything else. Mr. Weinberg goes out, takes some pictures, something isn't right. I don't know what it is.
>
> MR. WEINBERG: Your Honor, I object to this line of characterization regarding myself.
>
> THE COURT: The jury will be bound by the evidence it's seen and remembers it [sic] and will render its verdict accordingly.
>
> MR. REIS: I don't know. I wasn't there. But, ladies and gentlemen, let's look at some other facts that Schnuck's can't say. . . .

In proper context, we view this argument as directed primarily to Plaintiff's integrity, not Mr. Weinberg's. The thrust of the argument was that the delay in notifying Schnuck deprived Schnuck of any real opportunity to determine the condition of the parking lot at or near the time of the accident. As we have held earlier in this opinion, evidence of that delay was admissible. A fair inference from that evidence is that the delay and consequent prejudice to Schnuck's ability to determine the condition of the parking lot at the time of the incident was conscious and deliberate on the part of Plaintiff. The jury had a right to infer that the reason for the delay in notifying Schnuck was to gain some unknown advantage. How and when the concrete

---

8. By raising this problem here, we do not wish to imply approval of Plaintiff's other points set forth in this opinion. For the reasons discussed in the text, we had far greater difficulty deciphering this one.

curb came to be positioned as depicted in the photographs was never explained. However, there was evidence that it could not have been there just two months before the incident.

Schnuck's reference to Mr. Weinberg's role in taking the photographs is, under the circumstances presented, a fair comment on the evidence. Plaintiff testified on direct examination that Mr. Weinberg took the photographs. That occurred two weeks before Schnuck was notified of the incident. Thus, it was a fair inference from the evidence that Mr. Weinberg himself was present at the store but perceived some advantage in remaining silent and depriving Schnuck of the opportunity to verify that the condition of the parking lot was as depicted.

There can be little doubt that the inference drawn by Schnuck would be legitimate if Plaintiff himself had taken the photographs and remained silent without having employed counsel. Thus, reduced to its essence, Plaintiff's position appears to be that such inferences are rendered impermissible if counsel injects himself into the situation and thereby implicitly becomes an actor and a witness, because to question the Plaintiff's version at that point is to question counsel's integrity. If that is Plaintiff's contention, to state it is to demonstrate its invalidity. If this were the law, lawyers would in effect be permitted to substitute their presumed integrity for that of their client, thus shielding the client from intense scrutiny and from reasonable inferences opponents are entitled to draw.

We agree with Plaintiff that attacks on opposing counsel are deplorable. Yet the situation here is entirely attributable to Plaintiff's counsel's decision to involve himself personally in the formulation of evidence and to his advice or acquiescence in Plaintiff's decision to delay in notifying Schnuck of the incident. For this reason, the better practice is to have photographs taken by an independent third party who is in a position to testify to the manner and circumstances under which they were taken.

"Determining the prejudicial effect of final argument is a matter within the discretion of the trial court and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion." *Hoover's Dairy, Inc. v. Mid America Dairy Men*, 700 S.W.2d 426, 434 (Mo. banc 1985). We find no abuse of discretion. We also agree with Defendants that the trial court granted all of the relief clearly requested by Plaintiff.

■ Plaintiff next complains of the trial court's admission of Velma's deposition testimony about a fall she suffered in March of 1987 when she blacked out at the Lake of the Ozarks. Plaintiff claims that there was an inadequate foundation upon which to conclude that the prior fall occurred for the same reason. Defendant urges that Plaintiff did not object on this basis at the time of Velma's deposition and that his objection at trial was therefore too late. We need not decide this point because evidence concerning this particular fall and other falls was read into evidence from Velma's medical records without any objection as part of Schnuck's case. Thus, any error in admitting Velma's deposition testimony on this point was harmless.

■ In his final point, Plaintiff complains of the trial court's refusal of his tendered Non–MAI jury instruction concerning the effect of Velma's preexisting injuries on his right to recover damages. We need not determine this point in view of the jury's finding of no fault on the part of any party. Any error in refusing this instruction was thereby rendered harmless.

For the foregoing reasons, the judgment is affirmed.

CARL R. GAERTNER, P.J., and CRANE, J., concur.